**IN THE COURT OF COMMON PLEAS FOR THE STATE OF DELAWARE**

**IN AND FOR NEW CASTLE COUNTY**

CRYSTAL HART,

    Plaintiff-Below/Appellant,

          v.

DAN EYE AND JEN EYE,

    Defendants-Below/Appellees.

)
)
)
)
)
)
)
)
)
)

C.A. No. CPU4-13-003183

Submitted:  October 13, 2014
Decided: December 11, 2014

Crystal Hart
12 Tennyson Court
Middletown, Delaware 19709
*Plaintiff-Below/Appellant, Pro Se*

Dan and Jen Eye
611 Comstock Avenue
Downingtown, PA 19335
*Defendants-Below/Appellees, Pro Se*

## DECISION AFTER TRIAL

This is matter is before the Court on appeal from a Justice of the Peace Court Order entered on September 24, 2013, and docketed in the Court on October 9, 2013. This is the Court's decision following trial held on October 13, 2014.

### PROCEDURAL BACKGROUND

Plaintiff-Below/Appellant Crystal Hart (hereinafter "Hart") brings this action to recover a deposit she paid pursuant to an agreement to purchase a residential property. Hart alleges that she paid a $5,000.00 deposit upon execution of the agreement, and when the sale did not go forward, Dan Eye and Jen Eye, Defendants-Below/Appellees (hereinafter "the Eyes") refused to refund or authorize the refund of her deposit as required by the agreement. On November 4, 2013, the Eyes filed an answer admitting that the money had not been returned, but contend that fraud was

committed, and that Hart violated an addendum to the agreement of sale signed on May 24, 2013.

Therefore, the Eyes allege that they are entitled to retain the deposit.

**FACTS**

Hart testified that on April 10, 2013, she was pre-qualified for a mortgage, and on April 12, 2013, she entered into an agreement with Jen and Dan Eye to purchase real property they owned at 617 Suffolk Court in Middletown, Delaware.[1] The parties executed a standard Delaware residential sales agreement.[2] Hart testified that at the time she signed the agreement, she was pre-approved for mortgage financing with Pike Creek Mortgage Services, Inc. for a Federal Housing Authority ("FHA") insured loan up to $330,000.00.[3] She further testified that at the time of the agreement, she owned another FHA-financed property, which she intended to rent and use the income to partially apply toward the new FHA loan. Hart introduced as Exhibit #3 duplicate copies of her check ledger which indicate two checks in the amount of $2,500.00 were paid to Patterson & Schwartz Realtors as a deposit to purchase the residential property.[4]

Hart testified that on June 21, 2013, she was notified that the loan which was previously approved was now denied by FHA. The basis for the subsequent denial she was informed was because she had an existing FHA mortgage on her present residence and did not have the requisite 25% equity value in the property necessary to hold multiple FHA-financed properties.

The parties were scheduled to settle on June 7, 2013. When the original settlement could not occur due to the mortgage denial, the parties on May 24, 2013 signed a document titled "Endorsement to Agreement of Sale" which provided that the mortgage commitment was now due

---

[1] Hart was represented in the transaction by Nicole Geames of Prudential Fox & Roach Realtors. The Eyes were represented by Carol Blackburn of Patterson Schwartz Realtors.
[2] *See* Pl.'s Ex. 1 and Def.'s Ex. 1.
[3] Def.'s Ex. 6. The pre-approval notification.
[4] Pl.'s Ex. 3.

on June 14, 2013, with the settlement date extended to June 26, 2013.[5] This document, in addition to extending the settlement date, provided that the buyer, "Hart", was to be pre-approved by Tim Roach of Trident Mortgage by May 29, 2013. Additionally, it provided that Seller reserves the right to declare the Agreement of Sale null and void if the buyer does not qualify. The last sentence of the document indicates that "good faith deposit monies shall be returned to Buyer.[6]

Following the execution of the addendum there are a series of e-mails from Pike Creek Mortgage indicating mortgage financing was denied by Trident's underwriting staff on the basis of inadequate equity in the current home and debt-to-income-ratio.[7] On June 21, 2013, Hart was notified that her mortgage application was denied because she had insufficient income for mortgage payments, inadequate collateral, and insufficient equity in her current residence.[8] After unsuccessfully attempting to revive the loan, Hart notified the Eyes that based on the denial, the deal could no longer continue. Hart signed a release form to have the deposits returned to her. However, she subsequently learned that the Eyes refused to return the money.

Dan Eye testified that he and his wife refused to sign the release deposit because Hart violated the contract. He points to section 6 of the agreement which requires Hart to diligently and in good faith pursue financing. He testified that Hart provided fraudulent documents to the mortgage lender by not disclosing that she owned a house with FHA financing at the time of the loan application. He relies on a document dated June 15, 2013 from Trident Mortgage Company which states "a person can only hold one FHA mortgage at a time unless you can show that you are

---

[5] *See* Pl.'s Ex. 5, Def.'s Ex. 8. The addendum calls for Hart to be pre-approved by Trident Mortgage Company. Additionally, the addendum calls for all **good faith** deposit monies to be returned to Hart in the event that the agreement is voided.

[6] Pl.'s Ex. 5.

[7] Pl.'s Ex. 2.

[8] Pl.'s Ex. 2. In order to have two FHA loans at once, the FHA requires that borrower is relocating to an area not within reasonable commuting distance from the current primary residence, or an increase in family size to the point that the present house no longer meets the family's needs. Furthermore, to count rental income from the first FHA property on a new FHA mortgage application, the borrower must own at least twenty-five percent equity in the initial property, which may create a debt-to-income ratio issue.

moving from another area of the country, or you are moving because your current house is too small."[9] Eye also points to several e-mails where the issue surfaced whether Hart had a foreclosure on her credit report which was not disclosed.[10]

Nicole Geames testified that there were no issues with financing at the time of the approval letter. However, the settlement date had to be extended because after she was pre-approved, a debt-to-income-ratio issue arose regarding her first home. Geames further testified that Blackburn, the Eyes' listing real estate agent knew that Hart had another FHA mortgage at the time of the purchase agreement's execution because she disclosed that information to them..

## PARTIES' CONTENTIONS

Hart seeks the return of the deposit relying upon the terms of the agreement, which require that all deposits made in good faith must be returned. Hart contends she acted in good faith in her reliance on the advice of real estate professionals in making her offer on the house, as well as the April 10 pre-approval letter.

The Eyes advance two arguments that they are entitled to retain the deposit money. First, they aver that Hart's failure to fulfill the "time is of the essence" clause in the agreement for sale and the addendum constitutes a breach of the contract, and therefore Hart forfeits her right to a return of the deposit.

Second, the Eyes argue that based on the implied covenant of good faith, as well as the good faith provisions found in the contract, Hart negotiated in bad faith when she did not disclose that she owned a property with an FHA insured mortgage. The Eyes allege that had they known that fact, they would not have accepted Hart's offer. The Eyes further argue that the deposit belongs to

---

[9] Def.'s Ex. 2.
[10] *See* Def.'s Ex. 4, 5 and 7.

4

them because Hart provided fraudulent information to the mortgage company when she was pre-approved for the loan.[11]

## ANALYSIS

The standard real estate sales agreement which is the center of this dispute contains several critical provisions. First, it contains a "financing contingency" clause, which provides that if Hart did not secure financing and provide a mortgage commitment letter to Blackburn before May 24, 2013, the Eyes had the right to void the agreement.[12] Second, the agreement contained a "time is of the essence" clause, prescribing a mortgage commitment date of May 24, 2013, and a final closing date of June 7, 2013.[13] The clause states that failure to meet the deadlines in the agreement constituted a breach of the terms of the purchase agreement, and would result in default. Finally, the agreement contained an "integration" clause, providing that the agreement and any addenda constituted the entire contract, and could not be modified except by written agreement signed by all parties.[14] The addendum executed on April 12, 2013 "Endorsement to Agreement of Sale" extended the settlement date, required pre-approval by Trident Mortgage by May 29, 2013, gives the seller the right to void the agreement, and provides the good faith deposit be returned to the buyer.

To prevail on a claim for breach of contract, the plaintiff must establish by a preponderance of the evidence that: (1) a contract existed between the parties; (2) the defendant breached an obligation imposed by the contract, and (3) the plaintiff suffered damages as a result of that breach.[15]

The record indicates that a valid contract existed between the parties. "Where there is an express stipulation in the contract that time is of the essence, courts generally consider such a

---

[11] The Eyes rely on Def.'s Ex. 3, a set of email communication between the Eyes and Blackburn, in which Blackburn discovered that Hart purchased a house via a FHA – insured loan two months prior to making an offer on their home. They contend that they were told that Hart rented her space, which factored into their decision to move forward with Hart's offer.

[12] Def.'s Ex. 1 ¶ 6(d).

[13] *Id.* at ¶ 8.

[14] *Id.* at ¶ 35.

[15] *Gregory v. Frazer*, Del. Com. Pl., 2010 WL 4262030, *1 (Oct. 8, 2010); *VLIW Technology, LLC v. Hewlett-Packard, Co.,* Del. Supr., 840 A.2d 606, 612 (2003).

statement to be unambiguous and refuse to admit parol evidence to refute it and so vary the terms of the written contract."[16] Here, the Agreement of Sale contains an unambiguous "essence" clause; therefore, this analysis is limited to the four corners of the contract and the addendum.

Both the purchase agreement and the May 24, 2013 addendum call for the return of *good faith* deposit monies to Hart in the event that the deal fails.[17] For example, the "financing contingency" provision states that if the buyer has diligently and in good faith pursued an application to obtain mortgage financing and the application is denied, the buyer may at his sole discretion void the agreement, in which case all deposits will be returned to him.[18] Additionally, the addendum to the Agreement of Sale requires good faith monies to be returned to the buyer.[19] Accordingly, to keep the deposit, the Eyes must show that Hart acted in bad faith.

The restatement second of "Contracts Section 205," provides that the concept of bad faith is actually an imprecise label for what is essentially some kind of unreasonable conduct in failing to act fairly and in good faith in discharging one's contractual responsibilities. That is, in every contract there is imposed on each party a duty of good faith which emphasizes faithfulness to an agreed common purpose and consistency with the justified expectation of the other party. The Chancery Court when addressing this issue held:

> " . . . the exact contours of the implied covenant of good faith and fair dealing are not always easily discernable in the case law. This is partly driven by the intensive nature of the doctrine, applied to the facts which the Court has to analyze.[20]

When considering this issue, the Delaware Supreme Court stated:

> [T]he term "good faith" has no set meaning, serving only to exclude a wide range of heterogeneous forms of bad faith. The covenant is best understood as a way of implying terms in the agreement, whether

---

[16] 69 Am. Jur. Proof of Facts 3d 99 (2002).
[17] *See* Def.'s Ex. 1, ¶ 6(a). *See also* Def.'s Ex. 8.
[18] *See* Def.'s Ex. 1, ¶ 6(a).
[19] *See* Def.'s Ex. 8.
[20] *Amirsaleh v. Board of Trade of the City of New York*, 2009 WL 3756700 (Del. Ch.)

6

employed to analyze unanticipated developments or to fill gaps in the contract's provisions. Existing contract terms control, however, such that implied good faith cannot be used to circumvent the parties' bargain, or to create a free-floating duty...unattached to the underlying legal document. Thus, one generally cannot base a claim for breach of the implied covenant on conduct authorized by the terms of the agreement. Recognized in many areas of the law, the implied covenant attaches to every contract.[21]

The Court continues to discuss the requirements of good faith in contracting:

Stated in its most general terms, the implied covenant requires "a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits" of the bargain. Thus, parties are liable for breaching the covenant when their conduct frustrates the "overarching purpose" of the contract by taking advantage of their position to control implementation of the agreement's terms.[22]

Applying the above principles to the facts of this case, Hart consistent with the contract procures a mortgage commitment from a reputable mortgage broker. The fact that it was subsequently determined that she had a disqualifying factor does not constitute fraud or bad faith. Further, when she was denied, she took steps to obtain alternative financing. While her efforts may not have been as quickly as defendants may have desired it, does not amount to fraud. Her reliance on the initial mortgage broker and subsequent action was reasonable based upon the facts. Hart testified that she relied on her mortgage professionals' opinion that she met the requirements to hold two FHA loans, as well as the April 10 pre-approval letter prior to submitting her offer to the Eyes. Moreover, testimony of the Eyes is not sufficient for the Court to conclude there was unreasonable conduct warranting a finding of bad faith by Hart or her agents. Finally, the Eyes presented no testimony that they suffered economic consequence as a result of the settlement not occurring as scheduled.

---

[21] *Dunlap v. State Farm Fire and Cas. Co.*, Del. Supr., 878 A.2d 434, 441-42 (2005)(Internal citations omitted).
[22] *Id.* (internal citations omitted).

Accordingly, on the claim for breach of contract, judgment is entered in favor of Crystal Hart in the amount of $5,000.00, costs and post-judgment interest at 5.75% until paid. The $5,000.00 judgment may be discharged by defendants releasing the deposit funds.

**SO ORDERED**

_____
Alex J. Smalls
Chief Judge

Hart v Eye-OP  Dec 2014